UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
CAROLYN FEARS, *et. al.*,                    :
                                              :
                   **Plaintiffs,**    :
                                              :   **02 Civ. 4911 (HB)**
    - against -                   :
                                              :
                                              :   <u>**OPINION AND**</u>
                                              :   <u>**ORDER**</u>
WILHELMINA MODEL AGENCY, INC., *et. al.*,   :
                                              :
                   **Defendants.**    :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      Plaintiffs, by and through Lead Plaintiffs' Counsel Boies, Schiller & Flexner LLP, as well as Hayes & Hardy LLP and Berger & Montague, P.C., request that I raise this Court's prior award of attorneys' fees and expenses, as well as adjust this Court's distribution of residual settlement funds, following the Second Circuit's remand of this litigation to this Court.  See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423 (2d Cir. Jan. 4, 2007).

      For the following reasons articulated below, Plaintiffs' requests are granted in part and denied in part.[1]

### I. BACKGROUND

      Familiarity with the facts of this litigation, as set forth in prior opinions,[2] is presumed and those facts will not be restated here.

---

[1] The Court would like to thank Christine Rose of Brooklyn Law School for her assistance in researching this Opinion.

[2] See Fears v. Wilhelmina Model Agency, Inc., 2004 U.S. Dist. LEXIS 8364, 2004 WL 1065543 (S.D.N.Y. May 11, 2004) (Pitman, J.) (sanctions); Fears v. Wilhelmina Model Agency, Inc., 2004 U.S. Dist. LEXIS 4502, 2004 WL 594396 (S.D.N.Y. Mar. 23, 2004) (Baer, J.) (summary judgment); Fears v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 11897, 2003 WL 21659373 (S.D.N.Y. Jul. 15, 2003) (Baer, J.) (class certification); Masters v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 8060, 2003 WL 21089073 (S.D.N.Y. May 13, 2003) (Pitman, J.) (strike opposition to class certification); Masters v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 7143, 2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003) (Baer, J.) (motion to dismiss); Masters v. Wilhelmina Model Agency, Inc., 2003 U.S. Dist. LEXIS 698, 2003 WL 145556 (S.D.N.Y. Jan. 17, 2003) (Baer, J.) (motion to dismiss); Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, 2005 WL 1041134 (S.D.N.Y. May 5, 2005) (Baer, J.) (approving class settlement, award of attorneys' fees, and distribution of residual funds); Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 10764, 2005 WL 1325297 (S.D.N.Y. Jun.

      A.  Approval of Settlement and Attorneys' Fees and Subsequent Reconsideration

On May 5, 2005, I approved the final proposed settlement of this litigation. See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, 2005 WL 1041134 (S.D.N.Y. May 5, 2005). I awarded attorneys' fees on the basis of claims made against the Settlement Fund, rather than the amount of the total Settlement Fund. Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *11-17. Accordingly, I awarded attorneys' fees of $3,759,583.16, which represented 40 percent of the claims made against the Settlement Fund at that time.[3] Id. at *52. I noted that that award of attorneys' fees equaled 17.2% of the entire fund.[4] Id. I noted, when I considered the quality of representation by class counsel, the previous sanctions that had been imposed on Plaintiff's counsel. Id. at *27-29. I awarded Class Counsel all its claimed expenses, which Plaintiff's counsel represented at that time totaled $1,590,164.65. Id. at *52. I also found acceptable counsel's estimate of $75,000 to $100,000 for the cost of fund administration. Id. On June 6, 2005, I declined, upon Plaintiff's counsel's motion for reconsideration, to modify my award of attorneys' fees. See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 10764, at *13-14, 2005 WL 1325297 (S.D.N.Y. Jun. 6, 2005).

On May 5, 2005, I also provided for the *cy pres* distribution of unclaimed residual funds to several charities,[5] pursuant to the clear and unequivocal dictates of the Settlement Agreement. See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *32-39; Settlement Agreement, October 12, 2004 ("Settlement

---

6, 2005) (Baer, J.) (denying motion for reconsideration of award of attorneys' fees, and distribution of residual funds); Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 12838, 2005 WL 1529577 (S.D.N.Y. Jun. 28, 2005) (Pitman, J.) (denying motion for reconsideration of sanctions); Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423 (2d Cir. Jan. 4, 2007) (remanding to district court).

[3] I noted that Plaintiff's counsel's combined lodestar was estimated by Plaintiff's counsel to total approximately 28,000 hours and $8,816,275. If one factored in 335 additional professional hours that four additional counsel spent on specific discovery tasks, Plaintiff's counsel's combined lodestar totaled $9,112,160. Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *21.

[4] Plaintiffs' counsel had requested 33% of the entire fund. Id. at *17. At the time, the entire fund comprised $21,855,000. Id. at *4.

[5] At that time, over $6 million of unclaimed residual funds remained in the Settlement Fund. Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *32 n.12.

2

Agreement") ¶ D.2(b)(4).[6]  Since the majority of the Plaintiffs were female, I chose, after extensive interviews with a variety of doctors and hospital administrators, etc., and in accordance with cy pres doctrine since the majority of the class was female, those that would address maladies that primarily affect women, by directing the residual funds to, e.g. an ovarian cancer research program, an eating disorders program, and others.  See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *39-51.

Plaintiffs, in their motion for reconsideration, argued for the very first time that I should have instead distributed residual funds to Plaintiffs pursuant to my authority to award treble damages for antitrust violations under the Clayton Act.  I declined to modify the distribution of residual funds, based on the fact that the Settlement Agreement did not mention the possibility of an award of treble damages.[7]  See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 10764, at *9-13.  Interestingly, Plaintiffs' counsel had fought to achieve just this settlement and had urged me to review the terms of the settlement with each Defendant separately just to make sure it was what each Defendant understood to be the terms and would agree to.

Plaintiffs, and Plaintiffs' counsel, appealed to the Second Circuit Court of Appeals on October 25, 2005.  See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 433-34 (2d Cir. 2007).

B.  Second Circuit Opinion and Remand

The Second Circuit, on January 4, 2007, vacated this Court's award of counsel fees.  Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 426, 436-38.  The Second Circuit clarified its prior holdings and held explicitly that an award of counsel fees in a class action must be based on the amount of the total Settlement Fund, rather than claims made against the Settlement Fund.  Id. at 437.

---

[6] "If the sum of the Total Recognized Losses of all Authorized Claimants who submit valid and timely proof of claim forms is less than the amount of the Net Settlement Fund, then the Court shall, in its discretion, determine the disposition of the amount representing the difference between the two figures, after hearing the parties hereto as to such disposition." Settlement Agreement ¶ D.2(b)(4).

[7] Plaintiffs also argued that I possessed the authority to award prejudgment interest to Plaintiffs.  I similarly held that as the Settlement Agreement was silent as to prejudgment interest, I did not possess such authority.  Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 10764, at *11.  Accordingly, I declined to award prejudgment interest. Id. at *13.

3

The Second Circuit also held that it was error for this Court, when it awarded attorneys' fees, to take into account the conduct for which Plaintiffs' counsel had been sanctioned. Id. at 437. It reasoned that since the Magistrate Judge had already imposed a fine and ordered Plaintiffs' counsel to exclude certain charges from its fee petition, for me to consider those sanctions in a determination of attorneys' fees would be "double count[ing]." Id.

The Second Circuit also held, citing a single district court decision from Illinois, that this Court possessed the discretion, notwithstanding the fact that the parties had concluded not to include it in the Settlement Agreement, to award treble damages to Plaintiffs.[8] See id. at 435-36 ("[A] treble damages award did lie within… the District Court's discretion and should be considered on remand"), citing In re Folding Carton Antitrust Litig., 557 F. Supp. 1091, 1104-07 (N.D.Ill. 1983) ("Folding Carton"). Although the Second Circuit declined to hold that this Court's *cy pres* allocation of excess funds to charities constituted an "abuse of discretion," it directed me on remand to consider that *cy pres* allocation anew in light of my discretion to award treble damages to Plaintiffs. See id. at 436.

C. Plaintiffs' Instant Request

Following remand, Plaintiffs and Plaintiff's counsel submitted this instant request. Plaintiffs' counsel requested that I award additional attorneys' fees of $2,977,842.33, on top of my original May 5, 2005 award of $3,759,583.16, for a total of over $6.7 million dollars. See Points and Authorities In Support of Plaintiffs' Request For Adjustment and Supplementation of Class Awards, Attorneys' Fees, and Expenses, April 9, 2007, ("Pl. Mem.") at 11. Such an award would constitute 33% of the entire Settlement Fund, which echoes Plaintiff's counsel's original fee request of December 2004. Id. Of the additional almost three million dollars requested, $1,109,739.50 represents 2,744.3 hours of

---

[8] The Second Circuit rejected Plaintiffs' argument that class members were entitled to prejudgment interest. "…[T]he Clayton Act does not allow for prejudgment interest in the absence of a finding of bad faith on the part of defendants causing a material delay in the adjudication of the dispute… a finding not made here." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 435-36 (internal citation omitted), citing 15 U.S.C. § 15(a).

4

additional work by Plaintiffs' counsel since their original December 2004 fee request.[9] See Affirmation of Andrew W. Hayes, April 9, 2007, at ¶ 35. Plaintiff's counsel also has requested expenses of $70,835.36, representing counsel's expenses since its original fee request, and expenses of $90,782.16, representing additional costs incurred by the claims administrator.[10] Id. at 16.

Plaintiffs also proposed several alternative dispositions for the remaining residual funds, in light of the Second Circuit's holding that this Court possesses the discretion to award treble damages to Plaintiffs. (Plaintiffs noted that their proposed alternative dispositions were not mutually exclusive.)

First, Plaintiffs proposed that this Court award residual funds to claimants who filed late claims after September 15, 2006. Secondly, Plaintiffs proposed that already-compensated claimants receive a *pro rata* distribution of the residual funds in excess of the single damages already awarded to them. Third, Plaintiffs proposed that already-compensated claimants receive compensation for the portions of their claims that predated the statute of limitations in this action (i.e., claims that arose before 1998). Fourth, Plaintiffs proposed that claimants already compensated in this action receive compensation for state-law causes of action that were dismissed from this action, but have been brought in a separate, but factually similar, state court class action. (Many claimants in this action are also class members in the state court class action.) Lastly, Plaintiffs proposed that I simply allocate the residual funds to the state Court supervising that separate, but factually similar, state court class action to distribute as that Court sees fit.

D. Status of Settlement Fund

As of April 30, 2007, as reported by the Claims Administrator and certified by the Escrow Agent, the actual Settlement Fund comprises in total $21,705,000.[11] Five

---

[9] Of those 2,744.3 hours worked since December 2004, Plaintiff's counsel represents that 2,133.5 hours pertain to the appeal of this matter to the Second Circuit. See Affirmation of Andrew W. Hayes, April 9, 2007, at ¶ 35.

[10] Plaintiffs' counsel originally requested $64,898.66 for expenses incurred by the claims administrator. Subsequently, the claims administrator discovered a bookkeeping error, and after discussion between the claims administrator and plaintiffs' counsel, revised its request to $90,782.16. See Letter of Ed Sincavage, June 26, 2007, at 1-2.

[11] The proposed Settlement Fund comprised $21,855,000. See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *4. However, Plaintiffs represent, and Defendants do not dispute, that

5

distributions to claimants have been made, totaling $11,039,822.71 (including interest). Notice was mailed to the claimants in October 2004, per my Order of October 12, 2004. After several extensions of the initial January 6, 2005 filing deadline, the first distribution to claimants occurred on October 28, 2005. Subsequent distributions were made per my Orders which granted extensions for late filing of claims by class members. Said Orders were signed on January 3, 2006, February 15, 2006, July 28, 2006, and October 17, 2006. After taking into account a) interest accumulated on the Settlement Funds, and b) expenses paid, e.g. attorneys' fees and expenses already awarded, taxes, bank charges, administrator fees, and awards to named plaintiffs, there remains, as of April 30, 2007, $6,032,083.72 of residual Settlement Funds available for distribution.[12]

Additionally, it should be noted that although in my May 5, 2005 Opinion approving the settlement I awarded Plaintiffs' counsel its requested expenses of $1,590,164.65, Plaintiffs' counsel subsequently discovered that in its original expenses request it "double-counted" $240,701.38 of expenses, as well as $33,464.84 of associated accumulated interest. See Affirmation of Andrew W. Hayes, April 9, 2007, at ¶ 39; Letter of Ed Sincavage, June 26, 2007. Plaintiffs' counsel has returned that $240,701.38 of expenses, as well as $33,464.84 of associated accumulated interest to the Settlement Fund. Id. Thus, Plaintiff's counsel has, in actuality, been reimbursed for all expenses in the amount of $1,349,463.14, rather than the $1,590,164.65 I had originally allocated and had been sought.

## II.     STANDARD OF REVIEW

This Court's determination of a "reasonable" attorneys' fee award from a common fund is properly committed to its sound discretion. See Goldberger, 209 F.3d 43, 47 ("What constitutes a reasonable fee… will not be overturned absent an abuse of

---

Boss Models Inc., one of the Settling Defendants in this case, has yet to make its payments of $150,000 to the Settlement Fund. See Affirmation of Andrew W. Hayes, April 9, 2007, at ¶ 42. Plaintiffs' counsel represents that they have contacted David Bosman, one of the principals of Boss Models, to no avail. Id. It is expected that Plaintiffs' counsel will continue those efforts on behalf of the common fund, and that ultimately, Boss Models will satisfy its legal obligations to Plaintiffs and this Court.

[12] The claims administrator also estimates future expenses of $121,935.03 (i.e., $11,651.59 of estimated federal taxes, $19,501.28 of notice printing costs, and $90,782.16 of administrator costs). Taking into account the estimated future expenses of $121,935.03, there would remain $5,910,148.69 of residual Settlement Funds available for distribution.

discretion, such as a mistake of law or a clearly erroneous factual finding.") (citations omitted).[13]

This Court's allocation of residual funds derived from a class settlement is similarly properly committed to its sound discretion. See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 435, citing In re Agent Orange Prod. Liab. Litig. VI, 818 F.2d 179, 181 (2d Cir. 1987).[14]

### III.   DISCUSSION

A. Plaintiffs' Counsel's Requests for Adjustment of Attorneys' Fees and Supplemental Fees and Expenses

The Second Circuit, as noted, held that an award of counsel fees in a class action must be based on the amount of the total Settlement Fund, rather than claims made against the Settlement Fund. Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 437. Accordingly, the Second Circuit clarified its prior caselaw and held that my decision to base counsel fees on claims made against the fund was error. Id. "The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not." Id.[15]

The Second Circuit also noted that an award of counsel fees based on the total Settlement Fund does not necessarily constitute a "windfall" to plaintiffs' lawyers, as "the court may always adjust the percentage awarded in order to come up with a fee it deems reasonable in light of the Goldberger factors." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 437, citing Wal-Mart Stores, Inc. v. Visa, USA, Inc., 396 F.3d

---

[13] "Indeed, 'abuse of discretion' - already one of the most deferential standards of review - takes on special significance when reviewing fee decisions. 'The district court, which is intimately familiar with the nuances of the case, is in a far better position to make [such] decisions...'" Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47-48, citing In re Bolar Pharm. Co. Sec. Litig., 966 F.2d 731, 732 (2d Cir. 1992).

[14] A district court abuses its discretion when "(1) its decision rests on an error of law (such as application of the wrong legal principles) or a clearly erroneous factual finding, or (2) its decision - though not necessarily the product of a legal error or a clearly erroneous factual finding - cannot be located within the range of permissible decisions." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 435, citing Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir. 2001).

[15] As the Second Circuit noted, at the time, there was a "split of authority on the subject." See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 437, citing 7B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1803.1 (2d ed. 2004). The Second Circuit sided with Circuits that had taken the "basis of the entire Fund" approach. See id., citing Waters v. Int'l Precious Metals Corp., 190 F.3d 1291, 1295 (11th Cir. 1999); Williams v. MGM-Pathe Commc'ns Co., 129 F.3d 1026, 1027 (9th Cir. 1997).

96, 121 (2d Cir. 2005); Goldberger v. Integrated Res., Inc., 209 F.3d 43, 49-50 (2d Cir. 2000) ("Goldberger"). Those factors are "(1) counsel's time and labor; (2) the litigation's complexities and magnitude; (3) the litigation risks; (4) quality of representation; (5) the relationship of the requested fee to the settlement; and (6) considerations of public policy." Id. at 436, citing, e.g., Goldberger at 49-50.

In my May 5, 2005 Opinion, notwithstanding my decision to base counsel fees on claims made against the settlement fund, I noted that my award of counsel fees of $3,759,583.16 represented 17.2% of the entire settlement fund. Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *52. I analyzed that award in light of the Goldberger factors. See id. at *17-32. Specifically, I analyzed the relationship of the requested fee to the settlement, and cited caselaw which supported the proposition that an award of 17.2% of the entire settlement fund is within a "reasonable" range for counsel fees. See id. at *30 n.11, citing, e.g., In re Interpublic Secs. Litig., 2004 U.S. Dist. LEXIS 21429, 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004) (setting fee award at 12% of the entire settlement fund (distributed in stock and cash) where plaintiffs' counsel had sought 17% of entire fund); In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (setting fee award at 6.5% of the entire settlement fund where plaintiffs' counsel sought 18%); In re Twinlab Corp. Sec. Litig., 187 F. Supp. 2d 80 (E.D.N.Y. 2002) (setting fee award at 12% of common fund where plaintiffs' counsel sought 33%); In re Fine Host Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 19367, 2000 WL 33116538, at *6 (D. Conn. Nov. 8, 2000) (setting fee award at 17.5% of the settlement fund where plaintiffs' counsel sought 33.3%).

Plaintiff's counsel notes that unlike the above cases, plaintiff's counsel's fee in this case was a negative multiplier of its lodestar.[16] However, a negative multiplier of plaintiff counsel's lodestar is not out of the ordinary in common fund cases, particularly where awarding a positive multiplier of the lodestar may "swallow up" a significant portion of the settlement funds. See In re NTL, Inc. Secs. Litig., 2007 U.S. Dist. LEXIS 13661, at *29-31 (S.D.N.Y. Mar. 1, 2007) (collecting cases), citing, e.g., In re Sterling Foster & Co. Sec. Litig., 2006 U.S. Dist. LEXIS 80861, 2006 WL 3193744, at *8

---

[16] Plaintiff's counsel's fee award represented 42% of its calculated lodestar (or 41.2%, if one calculated the lodestar by taking into account the additional 335 hours four counsel spent on specific discovery tasks). See note 3, supra.

8

(E.D.N.Y. Oct. 31, 2006) ("without the negative multiplier, [counsel's] lodestar amount would swallow up a significant amount of the settlement fund.").

Accordingly, I see little reason to modify my original award of 17.2% of the entire settlement funds and find it to be "reasonable" in light of the six Goldberger factors.[17]  That said, two issues warrant mention, in light of the Second Circuit's directives, and events subsequent to my May 5, 2005 Opinion.

First, the Second Circuit held that my consideration of sanctions against plaintiff's counsel, when I considered the Goldberger factor of "quality of representation," was error.  Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 437.  Plaintiff's counsel, as I noted, had previously been sanctioned $25,000 and directed to excise certain claimed fees from its fee application.  Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *27-28.  Those fees totaled $119,784.50.  See Affirmation of Andrew Hayes, June 22, 2007.  The Second Circuit, without citing caselaw, expressed a concern that there be no "double counting" of these sanctions.  See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 437.

On remand, without consideration of the prior sanctions against Plaintiffs' counsel, I still find that the initial award of 17.2% of the entire settlement funds was "reasonable" upon new consideration of the quality of representation, and the other five Goldberger factors, particularly the size of the requested fee in relation to the agreement, as noted above.

Secondly, Plaintiff's counsel avers that it has expended substantial additional time, effort, and money on this litigation since its original December 2004 fee application.  Plaintiff's counsel represents, and Defendants do not dispute, that Plaintiff's counsel has, inter alia, monitored claims and responded to class members' inquiries; provided status reports to the Court; successfully moved for extensions of filing deadlines; overcame opposition from Defendants to put the settlement into effect; investigated instances of alleged agency misconduct and complaints that defendants were not complying with the Settlement; overcame Defendants' opposition to disbursement of

---

[17] It is worth noting that there was hardly any opposition following my May 5, 2005 Opinion – not, I suggest, because the Defendants thought Plaintiffs' counsel deserved a higher fee, or because of a change in the settlement agreement, as made clear by the one Defendant that did submit an opposition, but because the settlement had been agreed upon and Defendants saw no reason to throw more time and money at the Court and as a consequence the Circuit in essence heard only from the Plaintiffs.

9

certain funds; and successfully appealed to the Second Circuit, in part, to obtain additional funds on behalf of the class members. See Pl. Mem. at 5. These activities represent 2,744.3 hours of additional work, calculated at $1,109,739.50. The Second Circuit appeal comprises the large majority of time expended, i.e. 2,133.5 hours.

The Court may award supplemental fees to counsel for work performed in relation to the litigation or settlement following counsel's initial fee application. See Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 515, 516 (2d Cir. 1998) (affirming district court's award of supplemental fees to class counsel for time and expenses spent defending the settlement), citing Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 98 (2d Cir. 1997); cf. West v. Manson, 163 F. Supp. 2d 116 (D. Conn. 2001) (plaintiff's class counsel in civil rights lawsuit awarded supplemental fees for post-settlement work in conjunction with monitoring of compliance with consent decree). Accordingly, as Plaintiffs' counsel has performed a benefit to the class with its additional post-settlement work, I will supplement my original May 5, 2005 award of counsel fees with an award of fees for supplemental work performed since the original fee application, in the same proportion to Plaintiff's counsel's requested fees as I originally awarded on May 5, 2005. As on May 5, 2005, I awarded Plaintiff's counsel 52% of its originally requested fees, I now award Plaintiff's counsel 52% of its requested supplemental fees – i.e., $577,064.54.

Thus, the total amount of fees awarded to Plaintiff's counsel in this litigation is $3,759,583.16 plus $577,064.54, resulting in a total of $4,336,647.70. This award represents 20% of the entire settlement fund as it stands today.[18]

Regarding Plaintiff's counsel's requests for expenses of $70,835.36, representing counsel's expenses since its original fee request, and expenses of $90,782.16, representing additional costs incurred by the claims administrator, I find those requests reasonable and both will be granted.

    B. Plaintiffs' Request for an Award of Treble Damages from the Remaining Settlement Funds

The Second Circuit, as noted above, has held that this Court, pursuant to the discretion vested in it by the language of the Settlement Agreement, possessed discretion

---

[18] This award represents 42.4% of Plaintiff's counsel's current lodestar of $10,221,899.50. See Pl. Mem. at 6 n.7.

10

to allocate funds to the class members as treble damages.[19]  Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 435-36, citing Folding Carton, 557 F. Supp. 1091, 1104-07.[20]  I will proceed under that assumption here.

"[C]ourts have the power and the responsibility to exercise equitable discretion to achieve substantial justice in the distribution of [unclaimed portions of settlement] funds."  Folding Carton, 557 F. Supp. 1091, 1105, citing, e.g., 3 Newberg, Class Actions § 5620j (1977).  Accordingly, I will consider, pursuant to my equitable discretion, the several alternative options proposed by Plaintiffs for allocation of the residual funds, as well as the *cy pres* allocation to charities that I directed in my May 5, 2005 opinion.[21]  As part of my consideration, I will weigh the "relative deservedness" of the claimants to the residual funds, a determination that is informed by "the punitive and compensatory policies of the antitrust laws… and the extent to which each [group of claimants] has been compensated for any actual injury it may have suffered."  Folding Carton, at 1105, citing United States v. Morgan, 307 U.S. 183, 194, 197-98, 83 L. Ed. 1211, 59 S. Ct. 795 (1939).

### 1.  *Single Damages Recovery for Late-Filing Claimants*

Plaintiffs request that I allocate part of the residual funds to pay certain class members claims that were filed late (in addition to previous late-filed claims which I

---

[19] It should be noted that it does not appear I possess discretion to award treble damages if such an award would increase Defendant's obligations under the Settlement Agreement.  See Dahingo v. Royal Caribbean Cruises, Ltd., 312 F. Supp. 2d 440, 446 (S.D.N.Y. 2004) (allowing payment of late-filed claims, Court noted, "where a change in the allocation of a settlement fund affects only the distribution among class members and not the obligations of the defendants, courts will exercise their equitable powers."), cited approvingly, Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 10764, at *9-11; compare In re Ml-Lee Acquisition Fund II, 1999 U.S. Dist. LEXIS 4084 (D. Del. 1999), at *6-8 (where Agreement provided for "reversion" of excess funds to Defendants, Court declined to exercise equitable discretion to allow late-filed claims because it would affect Defendants' obligations and thus "rewrite the Settlement Agreement").  Neither side has proposed such an option that would affect Defendants' obligations here.

[20] "The District Court, after hearing the views of the parties, is vested with discretion as to the disposition of the Excess Funds."  Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 435.  "[A] treble damages award did lie within the ambit of the District Court's discretion and should be considered on remand."  Id. at 436.

[21] Although some Defendants originally sought for the residual funds to revert back to Defendants, see Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *32, Defendants have not renewed that request on remand.  Indeed, even if Defendants did so, Defendants' equitable claim to the residual funds would be insubstantive.  See Folding Carton at 1105 ("The overriding Sherman Act policy of deterring price fixing violations… is the most important factor in assessing the defendants' possible equitable entitlement to the reserve fund…. [I]n light of [this policy] and the defendants' wrongdoing, we reject [defendants'] equitable claim to the fund.").

11

previously approved).  Specifically, Plaintiffs request that I pay seven claims postmarked through August 31, 2006, which have been evaluated and processed by the claims administrator, totaling $347,329.91 (plus interest); and seven claims postmarked between September 15, 2006 and April 11, 2007, which have been evaluated and processed by the claims administrator, totaling $255,929.22 (plus interest).  The Claims Administrator also requests additional time to procure documentation from 24 claimants, who request a total of $1,791,058.67 (although Plaintiffs' counsel estimates from prior experience that the ultimately approved claims will be one-third to two-thirds of that amount).

The Second Circuit emphasized that *cy pres* allocation is generally to be used after plaintiffs have had a full opportunity to make a claim and be compensated.  See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 ("We are confident that the district court, fully aware of the breadth of its discretion, will see to an appropriate distribution of the funds remaining after the models have been compensated for their actual losses.") (emphasis added), citing American Law Institute, Draft of the Principles of the Law of Aggregate Litigation ¶ 3.08 (proposed ALI rule limits *cy pres* distributions "to circumstances in which direct distribution to individual class members is not economically feasible, or where funds remain after class members are given a full opportunity to make a claim.").  Additionally, I noted previously that models, as class members go, are "notoriously peripatetic," see Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *7, and I have extended deadlines and approved prior late-filed claims so as to ensure that all deserving class members are fully compensated. Cf. Folding Carton, 557 F. Supp. at 1110 (Court, concomitant to its *cy pres* allocation to charitable foundation, directed final effort to assist class members in making claims).

In the spirit of the Second Circuit's directive, I have from the very beginning and will continue to provide class members with every opportunity to be compensated pursuant to the Settlement Agreement, and before this Court directs a *cy pres* distribution. Accordingly, I approve the two distributions of $347,329.91 (plus interest) and $255,929.22 (plus interest), for a total of $603,259.13 (plus interest).

Additionally, I have directed class counsel to send one final letter to claimants who have made a claim, but provided insufficient information for the Claims Administrator to process their claims.  This letter will inform these claimants that the

final deadline to provide documentation will be July 30, 2007.  Further, the Claims Administrator will not accept any additional claims that it receives after June 30, 2007.  Subsequently, the Claims Administrator will have until August 31, 2007 to provide me with their (truly) final audited and documented claims for approval.  No claims will be approved after that date.

### 2. *Pro Rata Distribution to Already-Compensated Claimants In Excess of Single Damages*

Secondly, Plaintiffs propose that I distribute the residual funds to already-compensated claimants in excess of their single damages, pursuant to the Second Circuit's holding that I possess discretion to award treble damages to Plaintiffs.  Plaintiffs represent that if I made such a distribution, these claimants would then recover 116% of their single damages.

It seems relevant to mention that in Folding Cartons, the case relied upon by the Circuit, that Court declined to award residual settlement funds to already-compensated class members in excess of single damages.  The Folding Cartons Court noted that plaintiffs in that case voluntarily settled their claims – specifically, their claims for treble damages which were not certain to be successful – and were amply compensated.[22]  See Folding Cartons at 1106 ("The [plaintiffs'] contentions that they have not been properly compensated and are therefore equitably entitled to an additional distribution proceed from the assumption -- for which there is absolutely no demonstrated basis -- that the class could have recovered treble damages…")  Accordingly, the Folding Cartons Court termed a further distribution to already-compensated class members to be an "undeserved windfall."[23]  Id. at 1107.

---

[22] The Folding Cartons Court also noted that plaintiffs in that antitrust action generally "passed on" any damages resulting from antitrust violations to consumers, and thus suffered little, if any, actual "out-of-pocket" injury at all.  Folding Cartons at 1106.  Such a concern is not present in this case regarding the model class members.

[23] Congress, when it provided for treble damages for antitrust violations, intended to create a private enforcement mechanism that would achieve two objectives – first, to "deter violators and deprive them of the fruits of their illegal actions," and secondly, to "provide ample compensation to the victims of antitrust violations."  Blue Shield of Va. v. McCready, 457 U.S. 465, 472 (1982).  Treble damages here would, admittedly, achieve the second goal of the antitrust laws in providing for "ample compensation" to the victims (notwithstanding Defendants' denials of liability).  It is that aim that the Second Circuit emphasized in its opinion that remanded this litigation.  See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 434, citing Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs, Inc., 635 F.2d 118, 127 (2d Cir. 1980) ("[f]ull

Additionally, it is unclear whether Plaintiffs have proven the requisite "actual injury" that normally underlies an award of treble damages for antitrust violations. To recover treble damages in an antitrust action under the Clayton Act, a plaintiff must prove that she "suffered actual injury in [her] business or property as a result of the defendant's violation of the antitrust laws." New York v. Hendrickson Bros., Inc., 840 F. 2d 1065, 1076 (2d Cir. 1988), citing 15 U.S.C.A. § 15(a); see also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 220 (2d Cir. 2004).

---

restitution of plaintiffs' losses is a no less central objective of the treble damage provision than the encouragement of private antitrust enforcement.").

That said, the policy rationale of deterrence is not achievable at this stage of this case, as this Court is foreclosed, pursuant to the Settlement Agreement, from requiring Defendants to incur additional obligations. If treble damages serve a deterrent purpose similar to that of punitive damages, see State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) ("[P]unitive damages… are aimed at deterrence and retribution"), one could argue that to impose treble damages here would be analogous to awarding punitive damages to a plaintiff without requiring that the money come from defendants – thus obviating the underlying rationale behind punitive damages, and in effect granting a "windfall" rather than punishing a wrongdoer. Cf. Folding Cartons at 1105-07 (noting "overriding Sherman Act policy of deterring price fixing," analyzing defendants' and already-compensated plaintiffs' equitable claims to residual funds, and distributing reserve funds to neither).

While on the issue of deterrence, it is worth noting that the non-monetary accords, reached only after this Court exercised a significant role in the discussion (perhaps a larger role than class counsel), will in the fullness of time be far more important than the monetary damages. I set them out here for those who may find them of interest.

First, the Agreement provides for increased transparency in the compensation process. "For a period of ten years from the date the Court enters the Final Judgment Order for that Settling Defendant, each of the Settling Defendants . . . will disclose to any and all Settling Defendant's models all compensation received by it on all bookings made for that model, including but not limited to, the service charge(s), mother agent fee(s), the gross fee received for the booking, and any other charge(s) or deduction(s) from the model's compensation." See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *5, citing Agreement ¶ B.7(c).

Second, the Agreement provides for an alternative dispute resolution mechanism to be incorporated into model contracts. "From the date the Court enters the Final Judgment Order for the Settling Defendant, each of the Settling Defendants . . . will include in its contracts with models an initial alternative dispute resolution procedure of non-binding mediation (no longer than three (3) hours [in] duration, unless agreed to the contrary in writing), to try to resolve disputes regarding the interpretation of, or the parties' obligations under, the contracts, with the fees of the mediator to be borne equally by the parties to the mediation, except that Next Management Co., Ford Model Management, LLC, Images Management and Zoli Management, Inc. shall pay up to $ 1,000, with any fees in excess of that amount to be shared equally by the parties, and with both parties paying their own attorneys' fees and costs, provided that nothing shall limit the ability of the parties to include additional dispute resolution procedures in those contracts…" See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *5-6, citing Agreement ¶ B.7(e).

Third, the Agreement provides for clear notice to models of the percentage commission charged by Defendants. "For a period of ten years from the date the Court enters the Final Judgment Order for the Settling Defendant, each of the Settling Defendants . . . during the negotiation of any oral Model Contract or written Model Contract . . ., will advise its models that the percentage commission charged the models on bookings for them (as a contractual term) is a negotiable term." See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *6-7, citing Agreement ¶ B.7(f).

14

Thus, a plaintiff seeking treble damages must establish: 1) an injury to his property or business; 2) the defendant's violation of antitrust laws; and 3) a causal connection between the defendant's violation and the injury plaintiff has suffered.  See Blue Tree Hotels, 369 F.3d 212, 220.  Such an antitrust injury must be proven regardless of whether or not the alleged antitrust violation is found to be *per se* illegal.  Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

Here, Defendants expressly denied any injury to plaintiffs, or violation of antitrust laws, in the Settlement Agreement.[24]  Thus, unless the Circuit's view is that this language too may be overcome by my equitable powers, it is at least unclear whether I possess discretion to award treble damages to Plaintiffs on the facts of this case.

In any event, the Folding Carton Court, when it declined to award residual funds to already-compensated plaintiffs, noted that plaintiffs settled without (and perhaps because of the lack of) a showing that treble damages were warranted.  Cf. Folding Carton at 1106 ("The [plaintiffs'] contentions that they have not been properly compensated and are therefore equitably entitled to an additional distribution proceed from the assumption -- for which there is absolutely no demonstrated basis -- that the class could have recovered treble damages…").  Leaving aside the question as to whether Plaintiffs can, as a matter of law, recover treble damages, Plaintiffs' voluntary settlement and Defendants' concomitant disclaimers of liability or damage counsel against Plaintiffs receiving treble damages as a matter of equity.[25]

Lastly, the small number of claiming class members who received a direct benefit, as compared to the large number of non-claiming class members who might receive an indirect benefit from a *cy pres* distribution, counsels against the equitable claim of the

---

[24] See, e.g., Settlement Agreement at 3 ("[T]his Agreement shall in no event be construed or deemed to be evidence of or an admission or concession on the part of Settling Defendants… with respect to any claim of fault, liability, wrongdoing or damage whatsoever… Settling Defendants have also denied and continue to deny, inter alia, the allegations that Settling Defendants conspired with each other or with other defendants, that the Representative Plaintiffs or Class Members have suffered damage, that models' commissions have been artificially fixed, raised or maintained by reason of the alleged conspiracies or otherwise, that the Representative Plaintiffs or members of the Class were harmed by any of the conduct alleged in the Action…") (emphasis added).

[25] Additionally, no Plaintiffs here objected to the settlement that failed to provide for treble damages.  Cf. Folding Carton at 1106 ("Every class member who filed a valid claim against the settlement fund and received a distribution from it was informed that its distributed share was final and represented full satisfaction of its claims against the fund. Not a single distributee contested the finality of the distribution to it at that time.").

15

already-compensated claimants. Defendants noted that less than 5% of the class submitted claims as of the date of this briefing. Ford Defendants' Memorandum of Law Addressing Issues on Remand ("Def. Opp.") ¶ 7.[26] Indeed, the Folding Cartons Court noted a similar disparity and found the equitable claim of the "few former claiming class members" to be far less than the non-claiming class members. See Folding Cartons at 1107 ("Even though the settlement fund was established for their benefit and, in effect, paid for in part with consideration furnished by them, the nonclaiming class plaintiffs have to date received no direct or indirect benefit from the settlement fund.")

Accordingly, pursuant to my equitable authority, I decline to award an *pro rata* distribution of the residual settlement funds to already-compensated class members in excess of single damages.

### 3. Pre-1998 Claims

Third, Plaintiffs propose that already-compensated claimants receive compensation from the residual funds for the portions of their claims that predated the statute of limitations in this action (i.e., claims before 1998). The Folding Cartons Court declined to distribute its residual funds in that manner, for much the same reason that it declined to award treble damages. Cf. Folding Carton at 1106 (noting "no demonstrated basis" for the assumption that "the class could have recovered treble damages for the entire 15 year period for which a conspiracy was alleged," noting that the settlement reflected "uncertainties" with respect to "liability and the period of damages," and distinguishing "additional settlement funds" from "what might have been their legal rights had [the] litigation proceeded through trial").[27]

It is at best unclear whether class members here might have recovered for claims outside the statute of limitations. Indeed, I found they could not. I decline, pursuant to my equitable authority, to award residual funds to already-compensated claimants for claims predating the statute of limitations.

---

[26] Plaintiffs note that the approximately 5% of class members who submitted claims received over 40% of the calculated single damages. Pl. Reply at 3.

[27] Plaintiffs cite In re Prudential Secs. Ltd. Partnerships Litig., 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. 1995) ("Prudential"), for the proposition that claimants whose claims are time-barred may share in the proceeds of a settlement. Prudential appears to be only marginally apposite, as the Prudential Court considered only the issue of settlement, not equitable claims to residual funds post-settlement.

*4. Shelton State Court Class Action Claims*

Fourth, Plaintiffs propose that I use the residual funds to compensate already-compensated claimants who also submitted claims in the Shelton v. Elite Model Management class action (No. 601076/03) currently pending in New York state court. Failing that, Plaintiffs propose that I simply allocate the residual funds in this action to the Shelton Court to distribute as that Court sees fit.

Plaintiffs point out that originally, I had dismissed from this action Plaintiffs' state law claims under Article 11 of the New York General Business Law for lack of a private right of action. See Masters v. Wilhelmina Model Agency, 2003 U.S. Dist. LEXIS 698 (S.D.N.Y. Jan. 17, 2003). Many of the same Plaintiffs in this action filed similar claims in state court. Subsequently, the state Supreme Court held that Article 11 did indeed provide a private right of action to plaintiffs. See Shelton v. Elite Model Mgt., Inc., 812 N.Y.S.2d 745, 756 (N.Y. Sup. Ct. 2005). The state court also held that the Article 11 claims were not time-barred. Id. at 757-58.

Without commenting on the underlying reasoning of the New York Supreme Court's ruling, the fact is that Plaintiffs provide no caselaw to support the proposition that a court may distribute residual funds in a class action to compensate for claims brought in another court (let alone simply give residual funds from a federal class action to a state court to distribute as it sees fit). Although Plaintiffs' state law claims may be based on similar factual predicates, they are different claims brought in a different court.

Accordingly, pursuant to my equitable authority, I decline to compensate Plaintiffs in this action for their state law claims currently pending in state court.

*5. Cy Pres Distribution to Charities*

The purpose of *cy pres* distribution, as the Second Circuit has counseled, is to "put the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d at 436, citing 2 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 10:17 (4th ed. 2002). "[C]ourts have utilized *cy pres* distributions where class members are difficult to identify, or where they change constantly, or where there are unclaimed funds." Id., citing NEWBERG ON CLASS ACTIONS § 10:16 n.1. As noted above,

17

*cy pres* is generally limited to situations where plaintiffs have had a full opportunity to make a claim and be compensated.  See id., citing American Law Institute, Draft of the Principles of the Law of Aggregate Litigation ¶ 3.08.

As did the Folding Cartons Court, I conclude that *cy pres* distribution of the residual funds remains the "next best" compensation use for the indirect benefit of the class.  See Folding Cartons at 1110 (directing residual funds to tax-exempt foundation).  This Court has undertaken extensive research to identify charities that focus on services utilized by women and the underinsured and entail minimal administrative costs.  See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *32-39.  Other courts have utilized similar distributions to charities.  See, e.g., In re Motorsports Merch. Antitrust Litig., 160 F. Supp. 2d 1392, 1395 (N.D. Ga. 2001); Superior Beverage Co. v. Owens-Illinois, 827 F. Supp. 477, 478 (N.D. Ill. 1993).

It appears now, after several extensions of time (including another extension in this opinion), and multiple efforts by the claims administrator at my behest to take additional steps to locate class members, that class members have had every opportunity to make claims and be compensated before the application of *cy pres* doctrine.

In accordance with my original May 5, 2005 opinion, "pursuant to the terms of the Agreement, [and] in accordance with Second Circuit precedent,"  beginning no later than the first week of September 2007, if not before, and "assuming no legal impediments," the charities will receive residual funds (the "Residual Fund Distributions") as detailed in my original May 5, 2005 opinion, except where amended by this opinion.  See Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *36-38.  The Court reserves the right to amend the Residual Fund Distributions before, during, or after the disbursement depending on the availability of these funds.  Id. at *37 n.16.

After the initial distribution, additional distributions will be contingent upon achievement. Each entity will provide the Court in an annual report with information detailing what the project has accomplished.  The Court will retain jurisdiction over this aspect of the lawsuit.  The available funds (after all claimant dollars, attorneys' fees, and expenses have been disbursed in accordance with this Opinion and upon further order of this Court) will be deposited by the Administrator with the Clerk of Court and placed in

the Court Registry Investment System, Interest Bearing Account. Second year funds, where there was an agreement to a second year distribution, will only be released on authorization from the Court and based on the progress reported in the annual report for the first year.[28] The annual report will be forwarded to the Court eleven (11) months after the date of the initial distribution. Where the disbursement is in two installments, the second installment will include any accumulated interest. Any funds not allotted to any entity for failure to achieve reasonable progress or expansion, or for any other reason, shall be awarded to one of the remaining projects. See generally Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *36-38.

Accordingly, initial distributions will take place during the first week of September 2007 to the following charities: 1) a first-year installment of $500,000 (plus accumulated interest) to the Continuum Women's Cardiac Care Network, see Fears v. Wilhelmina Model Agency, Inc., 2005 U.S. Dist. LEXIS 7961, at *39-41; 2) a first-year installment of $500,000 (plus accumulated interest) to the Eating Disorders Program of the Columbia University Medical Center, see id. at *41-42; 3) a first-year installment of $250,000 (plus accumulated interest) to the Buprenorphine Program of the Division on Substance Abuse at Columbia University Medical Center, see id. at *43-44; 4) a first-year installment of $500,000 (plus accumulated interest) to the Ovarian Cancer Repository of the Columbia University Medical Center, see id. at *44-46; 5) a first-year installment of $500,000 (plus accumulated interest) to New York University Medical Center to be used for the Gender Differences of the Heart and Ballooning of the Heart Muscle programs, see id. at *46-48; 6) a first-year installment of $500,000 (plus accumulated interest) to the Civil Division of the Legal Aid Society, see id. at *49-50; and 7) a one-time payment of $250,000 to the "Heart Truth" campaign, see id. at *50-51.

After the payment of attorneys' fees, expenses, and claims approved in this Opinion, and the distribution of these funds, there will remain approximately $1,666,026.03 of residual funds (minus associated accumulated interest on claims made by plaintiffs and funds directed to charitable organizations). Thus, taking into account

---

[28] The charities should take note that owing to the additional attorneys' fees, expenses, and claims approved in this Opinion, it appears that approximately $1,158,352 (not including interest, some future expenses and taxes) will be available after the initial distribution to the charities. Thus, it is a near-certainty that not all of the second-year funds will be distributed as originally contemplated. Charities may want to take care to submit a report to the Court if they seek to receive funding for a second year.

the additional claims that the Claims Administrator will audit and present to the Court by August 31, 2007, and in the (increasingly unlikely) event that further claimants come to light in the next year, this Court will retain flexibility to ensure that class members are compensated if appropriate, in accordance with the principles of *cy pres* articulated by the Second Circuit.

## IV.   CONCLUSION

In accordance with the aforementioned reasoning, the particular attorneys' fees, expenses, additional claims, and residual distributions are hereby approved.

**SO ORDERED.**
July 5, 2007
New York, New York

U.S.D.J.