**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
CAROLYN FEARS and TIFFANY CONNOR, :
on their own behalf and on behalf of similarly :
situated persons, :
:
                      **Plaintiff,** :     **02CV4911(HB)**
     **-against-** :
:     **OPINION AND ORDER**
**WILHELMINA MODEL AGENCY, FORD** :
**MODELS, INC., CLICK MODEL** :
**MANAGEMENT, INC., NEXT** :
**MANAGEMENT COMPANY, BOSS MODELS,** :
**INC., GERARD W. FORD, DNA MODEL** :
**MANAGEMENT, LLC, IMAGES** :
**MANAGEMENT, INC. and IMG** :
**MODELS, INC.** :
                     **Defendant.** :
-------------------------------------------------------------x

**Hon. HAROLD BAER, Jr., District Judge:**

      Counsel for the Plaintiffs in this action request that I increase the amount of the

attorneys' fee award set by my July 5, 2007 Opinion and Order, *Fears v. Wilhelmina Model*

*Agency, Inc.*, No. 02 Civ. 4911 (HB), 2007 WL 1944343 (S.D.N.Y. Jul. 5, 2007) ("*Fears II*"),

following the Second Circuit's remand of this action. *Fears v. Wilhelmina Model Agency*, 315

Fed. Appx. 333, 334 (2d Cir. 2009) ("*Fears III*"). For the reasons that follow, the request of

Counsel is DENIED.

## I.     BACKGROUND

      Plaintiffs are a class of models who alleged that the Defendants, model management

companies, violated antitrust laws by colluding to set the commission-rates they paid to members

of the class. The facts of the case are set forth in previous opinions and will not be restated here,

although the instant request warrants a brief summary of the extensive proceedings that followed

settlement of the case in 2004. The case was vigorously litigated from the filing of the initial

complaint in June 2002 through the negotiation of preliminary settlement agreements that were

signed in or about May 2004 and, as to a final settling Defendant Click Model Management,

after a single day of trial in June 2004. Between June and October 2004, the parties engaged in

extensive settlement negotiations in which the Court was integrally involved. On October 12,

2004 the parties signed a formal settlement agreement (the "Settlement Agreement"), which

created a settlement fund of $21,855,000 (the "Settlement Fund") to be distributed to class members pro rata based on the amount of commissions they paid to the Defendants in excess of 10%. The Settlement Agreement also provided for several injunctive remedies designed to end practices that disadvantaged models, including, *inter alia*, prohibitions on the modeling agencies discussing their pricing with one another, and strict requirements that the agencies (i) disclose to each model the compensation received by the agency for booking him or her, (ii) use form contracts that fully disclose compensation terms and practices and (iii) inform their models that the percentage commission is negotiable. *See* Settlement Agreement ¶ B.7. Most of the non-monetary provisions were developed and pursued by the Court at several settlement conferences. The Settlement Agreement further provided that if monies remained in the Settlement Fund after Plaintiffs were compensated for their single damages (*i.e.* the amount by which the commissions actually paid to Defendants exceed 10% of their compensation), certain administrative costs were paid, and Plaintiffs' Counsel were paid their fees and expenses "if and to the extent allowed by the Court," then the Court "shall, in its discretion, determine the disposition" of such remaining funds (the "Residual Funds") "after hearing the views of the parties [to the Settlement Agreement] as to such disposition." *See* Settlement Agreement ¶ D.1-2.

On May 5, 2005, I issued an Opinion and Order that approved the Settlement Agreement, awarded attorneys' fees and expenses to Plaintiffs' Counsel, and provided for the distribution of Residual Funds, which at the time exceeded $6 million. (At last count, less than half remains for *cy pres* purposes.) Recognizing a split in circuit authority on the issue, I determined that attorneys' fees should be calculated so as to bear a relationship to funds claimed by class members. *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (HB), 2005 WL 1041134 (S.D.N.Y. 2005) ("*Fears I*"). Applying the factors set forth in *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 49 (2d Cir. 2000) ("*Goldberger*") which must guide a district court's determination of a "reasonable" attorneys' fee award from a common fund, I allocated to Plaintiffs' Counsel fees of $3,759,583.16, which represented 40% of the claims that had then been made on the Settlement Fund and 17.2% of the Settlement Fund itself.[1] Exercising my authority under the Settlement Agreement to determine the disposition of the Residual Funds, and after consultation with the parties and extensive investigation of my own, I ordered that the

---

[1] As of the time of their motion for final approval of the Settlement Agreement and an allocation of attorneys' fees and costs, Plaintiffs' Counsel had spent approximately 28,000 professional hours on the case and estimated a lodestar of $8,816,275 in fees, plus $1,590,164.65 in unreimbursed expenses.

Residual Funds be distributed to seven nonprofit or charitable organizations that provide services likely to indirectly benefit members of the class, namely organizations that provide health and legal services primarily to the uninsured and to women. *Fears I* at *12. These organizations include, *inter alia*, Columbia Presbyterian Medical Center's eating disorder, substance abuse, and ovarian cancer programs, and "The Heart Truth," a national educational campaign for women about heart disease that has previously worked closely with leading models and modeling agencies to promote health awareness.[2] *Id.* at 12-16.

Plaintiffs appealed my decision, arguing, *inter alia*, that I erred in ordering that the Residual Funds be allocated to the charities instead of to the class members who had already made claims as treble damages and prejudgment interest. *See Masters v. Wilhelmina Model Agency*, 473 F.3d 423 (2d Cir. 2007) ("*Masters*"). Plaintiffs' Counsel also objected to my award of attorneys' fees, which they contended was inadequate. The Second Circuit vacated the fee award set by my decision in *Fears I*, clarifying its earlier decisions to state expressly that "[a]n allocation of fees by percentage should . . . be awarded on the basis of the total funds made available, whether claimed or not." *Masters*, 473 F.3d at 437. The Second Circuit also found error in my fee award to the extent that my determination took into account conduct for which Plaintiffs' Counsel had already been sanctioned, noting without citation to case law that it "would be unfair to 'double count' for the sanctioned conduct." *Id.* The Second Circuit further held that I had authority to award treble damages to Plaintiffs and directed me to consider on remand my *cy pres* allocation in light of such authority. *Id.* at 436. It is interesting to note that at least to my recollection the Defendants made clear on more than one occasion that their contributions should in no way provide more money to the class members than was permitted by the formula.

Following remand and a request from Plaintiffs' Counsels' for an increase in their fee award, on July 5, 2007, I issued an Opinion and Order that reconsidered my initial allocation of the Settlement Fund in light of the Second Circuit's opinion. *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (HB), 2007 WL 1944343 (S.D.N.Y. Jul. 5, 2007) ("*Fears II*"). In that decision I referenced the statements in *Fears I* that the award of attorneys' fees represented

---

[2] The Wall Street Journal recently reported that "[i]ncidences of bulimia have tripled since the 1980s and anorexia incidences have also risen according to studies collected by the National Eating Disorders Association." Jeffrey Zaslow, *Girls and Dieting, Then and Now,* THE WALL STREET JOURNAL, September 2, 2009, at B7.

17.2% of the entire Settlement Fund and my citations there to case law that supported the proposition that such an award is "within a 'reasonable' range for counsel fees." *Id.* at *5. I further noted that applying a "negative multiplier" to counsel's lodestar is "not out of the ordinary in common fund cases, particularly where awarding a positive multiplier of the lodestar may 'swallow up' a significant portion of the settlement funds." *Id.* (citing *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK), 2007 WL 1294377 (S.D.N.Y. May 2, 2007)). Adhering to the Circuit's directive that I not consider the conduct for which Plaintiffs' Counsel was previously sanctioned, I concluded that "I still find the initial award of 17.2% of the entire settlement funds was 'reasonable' upon new consideration of the quality of the representation, and the other five *Goldberger* factors, particularly the size of the requested fee in relation to the agreement." *Id.*

In *Fears II* I also noted that Plaintiffs' Counsel had expended additional time, effort and money on this litigation since the December 2004 fee application—a large majority of it in connection with the appeal of my *Fears I* decision to the Second Circuit, which concentrated, in large measure, on the sufficiency of that decision's award of attorneys' fees. [3] As a consequence, and with no little concern, I allocated to Plaintiffs' Counsel supplemental fees of $577,064.54, which represented 52% of the amount of their request for supplemental fees, the same proportion that the initial fee award bore to Counsel's claimed lodestar. This brought the total fee award to approximately 20% of the Settlement Fund. I also granted Counsel's request to be reimbursed for $70,835.36 in additional expenses and authorized a distribution to the claims administrator of $90,782.16 for additional administrative costs.

Finally, I considered the Plaintiffs' several proposed alternatives for disposition of the remaining Residual Funds and ordered distributions to certain late-filing claimants. Once more I extended the deadline for potential claimants to provide documentation of their claims, and I considered but rejected the Plaintiffs' proposals for disposition of the Residual Funds. These proposals, which, by the way, were never even mentioned in the Settlement Agreement, included a proposal to allocate the Residual Funds *pro rata* to class members who had already been compensated, either as treble damages, as compensation for claims that predated the applicable statute of limitations, or as compensation for claims submitted in another case in the state courts,

---

[3] Specifically, 2,133.5 of the 2,744.3 additional professional hours (approximately 77.7%) were spent in connection with the appeal.

*Shelton v. Elite Model Management*.[4]  Ultimately, I concluded that *cy pres* distribution of the Residual Funds "remain[ed] the 'next best' compensation use for the indirect benefit of the class."  Further, I provided several extensions of time for class members to submit late claims and time for the claims administrator to make further attempts to locate class members.  In short the Court afforded them "every opportunity to make claims and be compensated" *before* the *cy pres* distribution.  *Fears II* at *7.

Plaintiffs' Counsel appealed again and the Circuit vacated my *Fears II* decision. *Fears v. Wilhelmina Model Agency*, 315 Fed. Appx. 333, 334 (2d Cir. 2009) ("*Fears III*").  The Circuit found although I was "certainly . . . not required on remand to increase [the] fee award" the explanation in *Fears II* as to the reasonableness of the fee award was "incomplete."  The Circuit remanded the case for reconsideration of the appropriate fee award.  *Id.* at 335. The Circuit squarely held, however, that if upon such reconsideration Residual Funds remain, it would not be an abuse of discretion to allocate such funds to charities pursuant to the *cy pres* doctrine "rather than to the plaintiffs as treble damages or pursuant to the plaintiffs' other alternatives," *i.e.* the proposals discussed above. *Id.* at 336.

Plaintiffs' Counsel has reapplied for its requested fee award of 33% of the Settlement Fund.  Plaintiffs' Counsel state that they have expended a total of $291,638.50 in fees and $10,464.86 in expenses since April 1, 2007, approximately 88% of which pertains to their second appeal.  This brings Plaintiff Counsel's combined lodestar to $10,513,538.00.  Because the additional fee distribution they seek exceeds the balance remaining in the Settlement Fund, Plaintiffs' Counsel request that I distribute to them the entire remaining balance of the fund.

## II.    DISCUSSION

### A. General Considerations

As the history of this long-running dispute makes clear, the task of awarding attorneys' fees from a common fund places the district court in the unique position of being required to exercise considerable discretion while essentially hearing from only one party.  "Because the adversarial system breaks down at this point of the litigation, just as the interests of the class and its counsel begin to diverge, the Court effectively becomes a fiduciary whose charge is to protect the class against excessive fees." *In re AOL Time Warner, Inc. Secs. and ERISA Litig.*, 02 Civ.

---

[4] Many of the Plaintiffs in this action have asserted in New York state court claims under Article 11 of the New York General Business Law, which I excised from this litigation in 2003. *See Masters v. Wilhelmina Model Agency, Inc.*, 02 Civ. 4911, 2003 WL 145556, *8 (S.D.N.Y. Jan. 17, 2003).

5575, 2006 WL 3057232, * 8 (S.D.N.Y. Oct. 25, 2006); *Goldberger*, 209 F.3d at 52 (the adversary system is "typically diluted—indeed suspended—during fee proceedings").  Here, the Defendants have settled and I have previously declined to return any Residual Funds to them. *Fears I*, 2005 WL 1041134, *10.  Therefore, apart from Plaintiffs' Counsel, the only parties with any skin in this game are the potential recipients of the Remaining Funds, a fact which places the interests of the Plaintiffs as a class—both those who have made claims on the Settlement Fund, and those who have not—in some tension with the interests of their counsel.  *Ling v. Cantley & Sedacca, LLP*, 04 Civ. 4566 (HB), 2006 WL 290477,*4 n.8 (S.D.N.Y. Feb. 8, 2006) (in fee application "interests of the class and their counsel are inexactly aligned").  As the Second Circuit stated in *Goldberger*, "a fee award should be assessed based on scrutiny of the unique circumstances of each case and 'a jealous regard to the rights of those who are interested in the fund.'" 209 F.3d at 53 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 469 (2d Cir. 1974)). As a consequence, district courts awarding attorneys' fees from a common fund must maintain an "overarching concern for moderation." *Goldberger*, 209 F.3d at 53

Throughout these extensive post-settlement proceedings, I have attempted to zealously discharge my duty to protect the interests of class members, particularly absent class members whose voices have not otherwise been heard in this litigation (although they have been given ample opportunities to speak).  Such concerns underlay the strong push I made during settlement conferences for meaningful injunctive relief applicable to the class as a whole and led me to exercise the discretion afforded by both the Settlement Agreement and the *cy pres* doctrine to award residual funds to charities that would confer indirect benefits on the class—an exercise of discretion that the Court of Appeals held to be proper.  *Fears III*, 315 Fed.Appx. at 336.  The concern for absent class members is especially pronounced in this case where, by Plaintiffs' Counsel's own estimates, only about 23% of the estimated damages were claimed against the fund[5] and the vast majority of class members made no claims at all.

Although deference to the district court "takes on special significance" in the context of fee decisions because the trial court is "intimately familiar with the nuances of the case," *Goldberger*, 209 F.3d at 47-48 (internal quotation marks omitted), the district court has an

---

[5] See Plaintiffs' Reply Brief in *Masters II* (noting $12 million has been paid to class members whose damage estimates were $52 million)

obligation to adequately explain the basis for its fee determinations; the remand from the Court of Appeals sought just such information and I do so now.

First, the Circuit stated that the *Fears II* decision did not reveal whether I had reconsidered the size of the requested fee in relation to the entire Settlement Fund because I "simply referenced [my] initial analysis of that *Goldberger* factor" despite the Circuit's earlier direction to measure the fee award against the entire fund and not the claims made thereon. As a consequence of the multivariate analysis by which the reasonableness of a requested fee must be judged, the mere fact that the Circuit required that I consider the size of the fee with reference to a larger sum does not necessarily mean that a reasonable fee award had to grow. As the Court of Appeals noted, "[t]he district court certainly was not required on remand to increase its fee award." *Fears III*, 315 Fed.Appx. at 335. In *Fears I*, I applied a percentage to the claims made—40%—that is at the far upper end of any scale in common fund cases while at the same time noting that the fee equaled approximately 17% of the entire Settlement Fund, which is itself squarely within the range of awards that courts have found to be reasonable. *See, e.g.*, *Farinella v. Paypal, Inc.* 611 F.Supp. 2d 250, 272 (E.D.N.Y. 2009) ("[A] review of 2008 district court decisions in this Circuit applying the *Goldberger* factors, place attorneys' fees of 28% at the high end of the spectrum.") Integral to my initial analysis in *Fears I* was the notion that if fees are to be compared to the claims made against the fund a *higher* percentage is warranted. Thus, when in *Fears II* I reconsidered the reasonableness of the fee award post-remand, the concomitant principle was implicit: when a fee award is assessed with reference to the entire fund, all else being equal, the "overarching concern for moderation" militates in favor of a percentage award closer to the center of the range. Accordingly, I referred to the cases cited in my earlier decision that approved fee awards ranging between 12 and 18% of the fund. *Fears II*, 2007 WL 1944343, *4. However, in their most recent opinion the Circuit found this past-tense discussion of my earlier decision to be unduly retrospective. *Fears III*, 315 Fed.Appx. at 335. Nevertheless, as discussed below, there is no doubt that a fee of 17 to 20% of the fund is squarely in the mainstream, *Farinella*, 611 F.Supp. 2d at 272 (citing ten recent cases in which the percentage fee awards averaged 17.41%), and following the directive to consider the requested fee with reference to the entire fund I believe it is proper to locate a percentage award towards the center, rather than the high end, of the spectrum.

Second, the Circuit faulted my *Fears II* opinion for its failure to explain how the danger of the fee award "swallowing up" the Settlement Fund was present in this case. To be clear, the specific danger with which I was concerned in *Fears II* and with which I remain concerned today is that Plaintiffs' Counsel's eight-digit lodestar is so large that any fee award in excess of the 20%-of-fund fee that I find reasonable will "swallow up" all the indirect benefits conferred upon the Plaintiffs' Class by the *cy pres* allocation. Maximizing benefits to the class must serve as a counterbalance to the awarding of fees. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 (2d Cir. 2005) ("In approving the district court's fee award, we recognize the sacrifice and commitment plaintiff's counsel made to its clients while preserving as much as possible for those who were harmed."). I took great pains to identify charitable organizations whose missions are likely to benefit the class of models, such as the eating disorder and substance abuse programs of Columbia Presbyterian Medical Center and I previously found such an allocation of Residual Funds to be the "next best compensation use for the indirect benefit of the class." *Fears II*, 2007 WL 1944343, *10 (citing *In re Folding Carton Antitrust Litig.*, 557 F.Supp. 1091, 1110 (N.D. Ill. 1983)).

Third and finally, the Court of Appeals noted that my *Fears II* opinion did not "revisit any of its findings that were favorable to counsel" under the *Goldberger* factors. *Fears III*, 315 Fed.Appx. at 335. As discussed below, when, in *Fears II*, I corrected the two errors of law identified by the Circuit it was not my intention to suggest that *all* of the *Goldberger* factors thus favored Plaintiffs' Counsel. But, it is equally clear that my analysis on this score may have been more thorough and consequently I undertake to provide such an analysis here. In amplifying the explanation of my decision in *Fears II*, however, it is not my intent to engage in improper "post hoc reasoning" with respect to my initial factual findings. *Roth v. Pritikin*, 787 F.2d 54, 58 (2d Cir. 1986). Rather, I make express the considerations that were implicit in that decision to comply with the mandate from the Circuit that I "explain adequately [my] reasons for determining that the unchanged award was reasonable." *Fears III*, 315 Fed.Appx. at 335.

**B. Analysis of the *Goldberger* Factors**

The Second Circuit has rejected reliance upon a "benchmark" recovery percentage and instead requires a "searching assessment" of the circumstances of each case based upon the "traditional criteria" for computing common fund attorneys' fees. *Goldberger*, 209 F.3d at 52. Consistent with *Goldberger* decision and the clear trend among district courts in this Circuit, I

have relied upon the percentage-of-the-fund method to determine the fee award that is "reasonable" in this case. These factors are as follows: (1) the time and labor expended by counsel; (2) the magnitude and complexity of the litigation; (3) the risk of the litigation; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Id.* at 50. The second and third factors favor Plaintiffs' Counsel for the reasons stated in my earlier decisions.

### 1. Counsel's Time and Labor

When counsel's lodestar is used solely as a "cross check" in connection with the percentage-of-the-fund method, "the hours documented by counsel need not be exhaustively scrutinized by the district court[;] [i]nstead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)." *Goldberger*, 209 F.3d at 50. Accordingly, in *Fears I* I summarized the hours worked by each of the firms that represented the Plaintiffs, but did not exhaustively scrutinize counsel's submissions concerning the hours they spent working on this case. I noted that the Plaintiffs' counsel had logged approximately 28,000 hours, which as an absolute value shows significant effort. *See, e.g., In re Merrill Lynch Tyco Research Securities Litigation,* 249 F.R.D. 124, 137 (S.D.N.Y. 2008) (noting 1,200 hours was small number in comparison to 9,000 hours over 4 years in another case). In *Fears I* I did not, however, opine whether this number of hours was reasonable in relation to the tasks required by discovery, motion practice, settlement negotiation and trial preparation, reflecting an efficient use of attorney time or whether the number was inflated. It is appropriate to consider whether the hours claimed appear excessive to have been spent in ways that suggest inefficiency or inappropriate staffing. *Ayers v. SGS Control Services, Inc.*, 03 Civ. 9078 (RMB), 2008 WL 4185813, *7 (Sep. 9, 2008). Although from the outset the sheer enormity of the claimed lodestar in this case has given me pause, the extent and demands of discovery and motion practice in this case—including, for example, 41 days of deposition— were such that the 28,000 hours expended by Plaintiffs' Counsel are not facially disproportionate or excessive.

Counsel, however, are entitled to compensation only for work that benefitted the class. *See Agent Orange*, 818 F.2d at 237 ("The critical inquiry when reviewing hours billed to the common fund in a class action is whether the work performed resulted in a benefit to the class.") There is a fine line between a hard-fought battle and unnecessarily contentious litigation, and

lawyer-hours that fall into the latter category do not benefit a client's interests.   From my vantage point, as prosecuted by Plaintiffs' Counsel, this litigation had elements of both sides of the coin: certain of Counsel's conduct that I observed first hand crossed the line between zealous advocacy that advanced the interests of the Class and unwarranted obstinacy that did not. The conduct for which Plaintiffs' Counsel was sanctioned by Magistrate Judge Pitman was merely emblematic of a consistent tenor of undue contentiousness for which Plaintiffs' Counsel was not solely responsible but to which they contributed and which, in my view, did not advance their cause.  Without "double counting" for the specific conduct for which they were sanctioned, given my "first-hand knowledge of this litigation," it is proper to "exclude excessive hours [Plaintiffs'] [C]ounsel expended on the action because of unnecessary contentious conduct." *Luciano v. Olsten Corp.* 109 F.3d 111, 117 (2d Cir. 1997).  Although an across-the-board reduction in hours for unduly contentious conduct is permissible, *see id.*, because the percentage-of-the fund method does not require "the hours documented by counsel . . . to be exhaustively scrutinized," I instead use my "familiarity with the case" and the manner in which it was prosecuted to "test" the "reasonableness of the claimed lodestar." *Goldberger*, 209 F.3d at 50.  In so doing I conclude that as a consequence of the manner in which the Counsel prosecuted this case the requested fee of 33% of the fund is unreasonable and that a reduced percentage fee toward the middle of the range is more appropriate.

On a similar note, "'common fund' cases do not permit an award of fees for work performed in the fee application process." *Mautner v. Hirsch*, 32 F.3d 37, 39 (2d Cir. 1994); *see also Peter Fabrics, Inc. v. S.S. Hermes*, 765 F.2d. 306, 317 n. 5 (2d Cir. 1985) ("courts have refused to award fees for services in connection with the fee application [under the common fund doctrine] . . . reason[ing] that fees are recoverable in such cases on the theory that the attorney's services benefitted the plaintiff's class while services performed in connection with the fee application confer no such benefit.")  Both appeals concerned the proper allocation of the Settlement Fund and in this sense, the class *qua* class received no benefit from the appellate work, although Plaintiffs' Counsel did seek to further the interests of discrete subsets of the class.  The substance of the second appeal concerned attorneys' fees almost exclusively. Consequently, while I do not quarrel with my decision to award $577,000 in supplemental fees in the *Fears II* decision, I decline to add to the lodestar that portion of counsel's instant request that pertains to appellate work—approximately 88% of that request, by their own estimate.  "The

fund, created for the benefit of a group or class, which already has been diminished by an award of fees, should not be further diminished by an additional award for work performed in fee applications." *Mautner*, 32 F.3d at 39.

As a consequence of the foregoing, the first *Goldberger* factor favors a substantial fee award, but not the full award sought by Plaintiffs' Counsel.

### 2. Quality of the Representation

In *Fears I*, I considered Plaintiffs' Counsel's resumes and achievements and took into consideration both the size of the Settlement Fund and the "formidable opposition from nationally recognized and respected law firms" to conclude that "the quality of representation appears to be *satisfactory*." *Fears I* at 2005 WL 1041134 at *8 (emphasis added). I reached this conclusion independent of any consideration of the discovery misconduct for which counsel was sanctioned and after noting that "oftentimes, the quality of representation prong of the *Goldberger* test is utilized to praise plaintiffs' counsel," and citing in a footnote twelve cases in which courts used highly laudatory descriptions of counsel. *Id.* at n. 10. Although perhaps a touch too subtle, the purpose of the contrast was to convey the doubts I had then and continue to harbor today about the way this case was prosecuted *independent* of the specific discovery misconduct for which counsel was sanctioned. One example is the unwarranted contentiousness discussed above. Another is the hands-on role that the Court was forced to take to press for injunctive relief during the course of settlement negotiations, relief that is arguably more meaningful than the eight-figure settlement because it applies to all models who work for the Defendant agencies including all those class members who made no claim on the fund. Furthermore, the small percentage of the class who made claims on the Settlement Fund suggests that Counsel's post-settlement efforts left something to be desired. Notwithstanding the fact that the class members are "notoriously peripatetic" the low response rate, even after several extensions of the claims period, suggested to me at the time of *Fears II* as it does now that at least the post-settlement claims administration should have been pursued with greater diligence. For example, I was informed on more than one occasion that fear of being "blackballed" played a role in the failure of many models to come forward, as they were afraid that a claim would impact their careers; an effort by their lawyers to address and ameliorate such concerns would have, in my view, resulted in more claims being made on the fund.

It is not disputed that Plaintiffs' Counsel secured a substantial settlement in uncharted waters, and this achievement goes a long way to confirm the overall quality of the representation provided to the class. Of course "the size of a recovery does not necessarily correlate with the quality of the representation, . . . [as] a 'large settlement can as much reflect the number of potential class members or the scope of the defendant's past acts as it can indicated the prestige, skill, and vigor of the class's counsel.'" *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02 Civ. 5575 (SWK), 2006 WL 3057232, *15 (S.D.N.Y. Oct. 25, 2006) (quoting *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977) (adopting report and recommendation of special master). Counsel diligently litigated against skilled adversaries, demonstrating representation of a quality that was satisfactory, acceptable, and expected. "'Courts should not necessarily award an increased fee where counsel simply displays the general level of skill expected.'" *Beane v. Bank of New York Mellon*, 07 Civ. 9444 (RMB), 2009 WL 874046, *8 (S.D.N.Y. Mar. 31, 2009) (quoting *Ling v. Cantley & Sedacca, LLP*, 04 Civ. 4566 (HB), 2006 WL 290477 (S.D.N.Y. Feb. 8, 2006)); *Ayers v. SGS Control Services, Inc*, No. 03 Civ. 9078 (RMB), 2008 WL 4185813 (S.D.N.Y. Sep. 8, 2008) (same). From my unique perspective, I have consistently believed that the quality of representation provided by Plaintiffs' Counsel was on a par with what was to be expected and that this *Goldberger* factor militates for a substantial fee award, but hardly the full 33% of the fund that has been sought.

### 3. Fee Request in Relation to the Settlement Fund

Allocation of a common fund is inevitably a zero-sum game. As discussed above, here any additional funds awarded to Counsel will necessarily diminish the indirect benefits conferred upon the class by the *cy pres* distribution, a concern that is heightened by the small number of class members who made claims on the fund. This is to say that although the figure against which the fee award was to be compared ostensibly grew as a consequence of the Circuit's decision in *Masters*, so too did a consideration that, in my view, militates against increasing the size of the fee award: namely, ensuring that some recovery is available to non-filing class members through application of the *cy pres* doctrine.

In this case, Counsel's claimed lodestar of $10,513,538 represents very close to 50% of the entire fund, and thus applying a negative multiplier to the lodestar is warranted. *See In re Sterling Foster & Co., Inc.*, 2006 WL 3193744, *8 (E.D.N.Y. Oct. 31, 2006) *vacated on other grounds by Levitt v. Rogers*, 257 Fed. Appx. 450, 451, 2007 WL 4460629, *1 (2d Cir. 2007)

(where lodestar was in excess of $700,000, without negative multiplier fee award would swallow up a significant amount of $1.4 million common fund); *In re NTL Secs. Litig.* 2007 WL 623808, at *8 (applying negative multiplier of .42% to lodestar where requested 20% fee award would have left only $7.2 million to be split among class members with alleged damages of $301 million); *Beane*, 2009 WL 874046, at *8 (applying negative multiplier where proposed lodestar was 46.1% of the Settlement Fund); *Silberblatt v. Morgan Stanley*, 524 F.Supp. 2d 425, 434 (S.D.N.Y. 2007) (awarding 20% of cash component of settlement fund and "negative multiplier of the 'lodestar' of 44%," where combined fees and expenses totaled 63% of the fund). Although the requested fee of 33% of the fund is itself a fraction of Counsel's claimed lodestar, such a fee award would eliminate any *cy pres* distribution and thereby eliminate the indirect benefits conferred upon the class. As discussed above, this concern, which fits into the *Goldberger* analysis under this fifth factor, together with my concerns about the hours expended without benefit to the class and the general quality of the representation, led me to conclude in *Fears II* that the original award of 17.2% of the fund, as increased by additional time spent on appeal, was reasonable. This is the same conclusion I reach in responding to the Circuit's concerns. As noted, the combined awards to Counsel to date are equal to approximately 20% of the Settlement Fund and approximately 42% of their lodestar.

An award in the range of 20% of the fund is squarely at the midpoint of reasonable awards approved by courts in the Second Circuit. *Farinella*, 611 F.Supp.2d at 272 ("[A] review of 2008 district court decisions in this Circuit applying the *Goldberger* factors, place attorneys' fees of 28% at the high end of the spectrum."); *Park v. The Thomson Corp.*, No. 05 Civ. 2931 (WHP), 2008 WL 4684232, *7 (S.D.N.Y. Oct. 22, 2008) (noting that proposed attorneys' fee of 24.1% is at the "high end of the spectrum"). Indeed, in *Farinella*, Judge Glasser surveyed the percentage awards of ten common fund cases in the Second Circuit in 2008 the *average* of which was 17.41%. *Farinella*, 611 F.Supp. 2d at 272. Of course every case is different and a "fee award should be based on scrutiny of the unique facts of each case," *Goldberger*, 209 F.3d at 53, but objective concepts such as "reasonableness" and "moderation" are necessarily informed by decisions reached by other courts in similar circumstances. Furthermore, "'courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable." *Masters*, 473 F.3d at 436 (citing *Wal-Mart Stores*, 396 F.3d at 122)).

#### 4. Public Policy Considerations

When it comes to public policy considerations, the Court must balance the "overarching concern for moderation" with the public policy of promoting private enforcement of antitrust laws. *See Goldberger*, 209 F.3d at 53; *Ayers*, 2008 WL 4185813 at * 8. The concern with moderation, of course, derives from the fact that in a common fund case that portion of the fund awarded to counsel is not available to class members. Here, in the exercise of my discretion, I have drawn the line at a fee that I believe adequately compensates Counsel for their efforts while preserving some funds for cy pres distribution as the "next best compensation use" for the indirect benefit of the class. In my view, the more than $4 million in fees already awarded to Plaintiffs' Counsel serves as adequate incentive to promote continued private enforcement of antitrust actions, notwithstanding that this award does not constitute the full amount of the fee request or Counsel's claimed lodestar. Furthermore, in my view promoting efficient and effective use of attorney time as well as civility in the legal provision are subsidiary public policy goals that are furthered by this award.

### III. CONCLUSION

Throughout the proceedings that have followed settlement of this action, I have attempted to diligently guard the interests of class members to the apparent consternation of Plaintiffs' Counsel. The view of the lawyers aside, this to me at least was the proper and appropriate role for the Court to play in a lawsuit such as this. The foregoing discussion amplifies the considerations that underlay my decision with respect to attorneys' fees in *Fears II* in order to comply with the mandate from the Court of Appeals, which directed me to "explain adequately [my] reasons for determining that the unchanged award was reasonable." *Fears III*, 315 Fed.Appx. at 335. Accordingly, the request by Plaintiffs' Counsel that the balance of the Settlement Fund be allocated to them is DENIED. The remaining funds will be distributed to the charities identified in the *Fears I* opinion pursuant to a separate order.

**SO ORDERED**
**September** 10 **2009**
**New York, New York**

U.S.D.J.